# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL J. MOORE, | ) | CASE NO. 4:15-cv-1424 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| OHIO EDISON COMPANY, INC., | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

In this employment action, plaintiff Michael J. Moore ("plaintiff" or "Moore"), who is African American, claims that his termination from defendant Ohio Edison Company[1] ("defendant" or "Ohio Edison") was the result of race discrimination and retaliation. The parties have now completed discovery, and the record confirms a much different story of an employee—with a well-documented history of performance issues and safety violations—who was discharged after he engaged in a pattern of threatening behavior toward another employee. On the strength of this record, defendant now seeks summary judgment on all claims asserted in the complaint. (Doc. No. 20 ["MSJ"].) Plaintiff has filed a brief in opposition (Doc. No. 23 ["MSJ Opp'n"]), and defendant has replied (Doc. No. 24 ["MSJ Reply"]). For the reasons stated below, defendant's motion for summary judgment is granted.

## I. BACKGROUND

Plaintiff commenced his employment with Ohio Edison on August 29, 2005 as a meter

---

[1] In its answer, defendant states that plaintiff erroneously identified it as "Ohio Edison Company, Inc." (Doc. No. 6 ["Ans."] at 44 n.1.) All page number references are to the page identification number generated by the Court's electronic docketing system.

reader, which is an entry level position. (Doc. No. 21 (Deposition of Michael J. Moore ["Moore Dep."]) at 364.) At the time he applied with Ohio Edison, plaintiff disclosed that he had prior convictions for armed bank robbery and use of a firearm to commit a violent offense.[2] (*Id*. at 361, 364.) *See United States v. Moore*, No. 4:92-CR-00302 (N.D. Ohio).

Plaintiff worked as a meter reader until he took a test in or around April, 2006, in order to enter Ohio Edison's apprenticeship program to become a lineman. (*Id*. at 364-65.) Following successful completion of the lineman's test, plaintiff was sent to "lineman school" where he learned how to, among other things, work safely and effectively maintaining and servicing Ohio Edison's power lines.[3] (*Id*. at 365.) Plaintiff's alleged difficulty interacting with co-workers appears to have started during his time in lineman school.[4] On January 11, 2008, plaintiff got into an argument with a fellow classmate and threatened to kill him. (Doc. No. 20-1 (Arbitration Hearing Transcript ["Arb. TR"]), Co. Ex. 1, at 247; Doc. No. 20-2 (Affidavit of Chad Hampson ["Hampson Aff."]) ¶ 10(c).) While plaintiff insists that he did not threaten his classmate, it is undisputed that one of the instructors reported the alleged incident to plaintiff's manager at the time, Robert Suttle. Further undercutting his position, plaintiff also testified that he had jokingly made a similar comment to another employee, and protested that everyone had a confrontation with the individual in question, all suggesting that something did transpire between the plaintiff and his classmate. (Arb TR at 252, 263-64; Arb. TR., Ex. 1 at 247.)

---

[2] According to plaintiff, he was sentenced for these offenses to a term of imprisonment of 123 months. (*Id*. at 361.)

[3] During this same time, plaintiff received training in driving Ohio Edison's trucks, and was ultimately awarded his commercial driver's license ("CDL"). (*Id*. at 365.)

[4] Plaintiff denies the vast majority of the allegations leveled against him by co-workers, and further disputes the factual predicate for most of the disciplinary action taken against him by Ohio Edison. Given the nature of plaintiff's claim that he received less favorable treatment than similarly-situated employees, as well as Ohio Edison's defense that it had an honestly held belief that these allegations were true, it is necessary to lay out the allegations made and the action taken by the company and various courts. The Court does not accept any of the underlying facts as true, and construes all disputed facts in a light most favorable to plaintiff as the non-moving party.

Plaintiff's performance appraisals reflected further upon his alleged poor interpersonal skills. Plaintiff repeatedly received unacceptably low marks for effectiveness, with comments including that: "Michael needs to work on being more of a team player," he needs to "work on his attitude," and he has an "antagonistic relationship with his fellow co-workers[.]" (Doc. No. 20-1 (Affidavit of David S. Farkas ["Farkas Aff."]), Co. Ex. 4, at 252-55.) These same performance reviews also documented plaintiff's deficient work skills and limited knowledge of line work. (*Id.*)

During his time with Ohio Edison, plaintiff was also disciplined numerous times for work rule and safety violations. On June 12, 2008, plaintiff was involved in an accident with a company truck, after which he left the scene and did not immediately report the accident as he was required to do. Following an investigation, plaintiff received a five-day unpaid suspension. (Arb. TR, Co. Ex. 2, at 248.) Plaintiff was disciplined a second time, on August 2, 2011, for engaging in unprofessional conduct and failing to observe safe work practices. According to the letter of suspension, plaintiff "displayed a cavalier, unsafe attitude" when he "left a conductor energized without performing a voltage test." (Arb. TR, Co. Ex. 5, at 257.) In addition to a five-day suspension, which he received in lieu of termination, plaintiff was removed from his troubleshooter role because of his "lack of commitment to [Ohio Edison's] safe work practices." (*Id.*)

The events that ultimately led to plaintiff's discharge, however, began on February 23, 2012 when fellow lineman Michael Davila filed with Ohio Edison an internal complaint against plaintiff for intimidation. (Arb. TR, Co. Ex. 10, beginning at 271.) According to Davila's complaint, the relationship between the two men began to sour in February 2011 when he and plaintiff were involved in a dispute over who should drive the company truck. After Davila

3

reported the dispute to his supervisor, he alleged that plaintiff became upset and threatened to get even with him. From that point on, the internal complaint alleged, plaintiff's behavior toward Davila became more and more menacing, to the point that Davila began to fear for his safety.

Davila's detailed complaint set forth several alleged incidents of harassment and intimidation. For example, on January 6, 2012, Davila claimed that plaintiff threatened that he would "woop [his] ass" and "make [Davila] suck [plaintiff's] private parts." (*Id*. at 274.) The following month, Davila alleged that plaintiff told him that "it was not over yet" and that if he ever caught Davila outside of work, he (plaintiff) was "going to F--- [Davila] up." He also threatened to enlist his cousin to beat Davila up.[5] (*Id*.) According to Davila's complaint, plaintiff's threats were often accompanied by vulgar taunts. Playing off the fact that he had once dated Davila's niece, plaintiff purportedly often told co-workers that Davila would kiss his niece after she had "suck[ed]" plaintiff's genitalia. (*Id*.; *see also* Arb. TR at 166.)

The internal complaint was not the only action Davila took in response to plaintiff's alleged threatening and harassing behavior. On February 23, 2012, Davila sought a protective order against plaintiff from the Trumbull County Court of Common Pleas. (Arb. TR at 180; Moore Dep. at 40-41; *see* Arb. TR, Co. Ex. 11, at 275.) In issuing the protective order against plaintiff, the state court made the following specific fact finding: "Respondent [Moore] has engaged in a pattern of harrassing [sic] and threatening conduct, including making multiple threats that he and/or others at his behest would cause physical harm to [Davila]." (*Id*. at 276, capitalization omitted.) Davila also reported plaintiff's conduct to the Youngstown Police

---

[5] At the arbitration that followed plaintiff's termination, co-workers testified that they heard plaintiff make similar threats against Davila. For example, Line Leader Dick Myers stated that plaintiff had once told him "he had relatives who had been to jail before and that they would be willing to go again if he needs them to. You know, [plaintiff] could have [Davila] taken out." (Arb. TR at 162.)

Department. (*See* Moore Dep. at 369.) Moore was charged with menacing but ultimately entered a guilty plea to disorderly conduct. (*Id*.; Arb. TR at 162-64, Ex. 14.)

Ohio Edison conducted an investigation into the allegations contained in Davila's complaint. As part of its investigation, the company afforded both Davila and plaintiff an opportunity to tell their side of the story. Plaintiff denied Davila's allegations, and "vehemently denied engaging in threatening or violent behavior." (MSJ Opp'n at 524, citing Moore Dep. at 370; Hampson Aff., Appx. 2, at 313.) Plaintiff elaborated on his position in the arbitration that followed his termination, wherein he denied ever threatening Davila.[6] (Arb. TR at 241-43, 246, 270-73.) Plaintiff maintained that it was Davila who had taunted him, and eventually threatened to get plaintiff fired. (*Id*. at 239-40, 283.) While he conceded that he had discussed with other employees his prior sexual relationship with Davila's niece, something that he acknowledges constituted poor judgment on his part (*id*. at 245), and he further conceded that he and Davila were no longer friends after their dispute over driving duties (*id*. at 283), he denied ever having made menacing or vulgar comments regarding Davila or his family. (*Id*. at 283-85.)

During the course of the investigation, members of human resources also interviewed several co-workers who largely substantiated Davila's allegations that plaintiff had threatened Davila and made disparaging comments about Davila and his family. (Hampson Aff., Appx. 2, at 312-15.) For example, fellow lineman Richard Meyers informed human resources that he heard plaintiff threaten to "whoop [Davila's] ass and make [him] suck [plaintiff's] private parts." (*Id*. at 312.) Witnesses also advised human resources that plaintiff had threatened to sue them if they

---

[6] Plaintiff did testify that he told a co-worker that he would have liked to choke Davila because he believed that Davila was trying to "set him up" and get him fired. He further qualified his comment by noting that it was said in jest and was merely an off-hand response to a co-worker's suggestion that he and Davila "hug it out." (Arb. TR at 248, 277.)

came forward and offered evidence against plaintiff. (*Id.* at 312-14.)

Human Resources Letter 412 sets forth Ohio Edison's policy entitled "Position Regarding Violence in the Workplace." (Hampson Aff., Appx. 3 ["workplace violence policy"], at 316-17; *see* Hampson Aff. ¶ 7.) The policy prohibits "[a]ny acts or threats of violence, whether verbal, physical or otherwise, conducted by one or more persons against another or others, at the place of work and/or in the course of employment[.]" (*Id.* at 316.) Included within the definition of "violent behavior" is: "[p]hysically harming, intimidating or threatening an individual, group of individuals, or relatives of those individuals" and "[v]erbally harming by means of slandering, ridiculing or maligning an individual, group of individuals or relatives of those individuals; name calling which is hurtful, insulting or humiliating; abusive and offensive remark[s]." (*Id.*)

After the investigation, Chad Hampson, then General Manager of Operations for Ohio Edison, made the decision to terminate plaintiff. (Hampson Aff. ¶¶ 1, 9.) Before reaching his decision, he reviewed the results of the company's investigation and plaintiff's personnel file, including plaintiff's performance appraisals and letters of discipline. (*Id.* ¶ 8.) Hampson concluded that termination was warranted in light of plaintiff's "violation of the workplace violence policy, his poor performance, and his work record." (*Id.* ¶ 9.) Hampson offered several reasons why he reached this conclusion: (1) plaintiff had engaged in a pattern of violent behavior toward a co-worker over a period of several months; (2) plaintiff's threats were extremely serious and prompted the victim to contact the police and seek a restraining order; and (3) plaintiff had a record of violent behavior, including prior convictions for crimes of violence and a prior violent threat upon a co-worker. (*Id.* ¶ 10.) According to Hampson, the "serious and repetitive" nature of plaintiff's threats, "as well as his history and violence, disciplinary issues,

6

and performance problems, were all important factors" in his decision. (*Id.* ¶¶ 11-12.)

Ohio Edison informed plaintiff of the decision to terminate his employment in a letter, authored by Hampson, and dated March 6, 2012. (Hampson Aff., Appx. 6, at 331.) The letter explained that "[i]n determining the accuracy of the allegations [lodged by Davila], the Company" had met with plaintiff "to hear [his] version of events and reviewed [his] account of the incident." The letter further advised plaintiff that the company had completed its investigation and concluded that his actions were "both contrary to acceptable workplace behavior and violative of HR Letter 412, 'Position Regarding Violence in the Workplace.'" (*Id.*) It further provided that "[t]he Company [had] also considered [plaintiff's] poor disciplinary record and time of service." (*Id.*) It is undisputed that plaintiff received this letter before he was interviewed at the step two grievance meeting between Ohio Edison and the union, which was also held on March 6, 2016. (Moore Dep. at 51, 54.)

Following his termination, plaintiff's grievance proceeded to arbitration, which took place on August 10, 2012. (Moore Dep. at 373; Farkas Aff. ¶¶ 4-5.) In October 2012, the arbitrator released his decision denying Moore's grievance. (Farkas Aff. ¶ 7, at 291; Moore Dep. at 373.)

On June 22, 2015, plaintiff filed the present action in the Mahoning County Court of Common Pleas, and defendant removed the action to this Court on July 20, 2015. (Doc. No. 1 (Notice of Removal).) Plaintiff's complaint raises claims for race discrimination under Ohio Rev. Code § 44122 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. (Doc. No. 1-1 (Complaint).) The complaint also raises a claim, under Ohio statutory law, for retaliation. (*Id.*)

## II. SUMMARY JUDGMENT STANDARD

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co*., 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary

judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 487 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted).

A party seeking or opposing summary judgment may rely on deposition transcripts, electronically stored information, affidavits, declarations, and other materials. Fed. R. Civ. P. 56(c)(1)(A). A party may object to any cited material on the ground that it cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). Rule 56 further provides that "[t]he court need consider only" the material cited in the parties' briefs. Fed. R. Civ. P. 56(c)(3); s*ee also Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). Nonetheless, the Court is at liberty to consider any record evidence in resolving a summary judgment motion. Fed. R. Civ. P. 56(c)(3).

### III. PLAINTIFF'S DISCRIMINATION CLAIMS

Because plaintiff relies on only circumstantial evidence of discrimination, the familiar *McDonnell Douglas* burden-shifting framework governs plaintiff's federal claim of race discrimination. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706-07 (6th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). Moreover, because "federal law interpreting Title VII . . . is generally applicable to cases involving alleged violations" of Ohio Rev. Code § 4112, the Court applies the same analysis to plaintiff's state law race discrimination claim. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981) (citations omitted); *see Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 469 (6th Cir. 2002) (applying the Title VII burden-shifting framework to a claim under § 4112.02).

Under this analysis, the employee has the initial burden of producing evidence of a prima facie case of discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) (citations omitted); *McDonnell Douglas*, 411 U.S. at 802. If the employee succeeds in establishing a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Burdine*, 450 U.S. at 253 (citing *McDonnell Douglas*, 411 U.S. at 802). Should the defendant offer a legitimate, nondiscriminatory reason, the burden shifts back to the employee to prove that the employer's offered justification was merely a pretext for unlawful discrimination. *Id.* at 253 (citing *McDonnell Douglas*, 411 U.S. at 804). Notwithstanding this burden-shifting paradigm, the ultimate burden of persuasion always remains with the employee who must demonstrate that he was the victim of intentional discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (citing *Burdine*, 405 U.S. at 253).

### A.    Plaintiff's Prima Facie Case

To establish a prima facie case of discrimination, a plaintiff must prove by a preponderance of the evidence that: (1) he is a member of a protected class; (2) he was subject to an adverse employment action; (3) he was qualified for the position; and (4) a similarly situated person outside the protected class was treated more favorably. *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 402-03 (6th Cir. 1999) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992)). There is no debate in this case that plaintiff has satisfied the first two requirements of the prima facie case as his race places him in a protected class and his employment with Ohio Edison was terminated. As to the third prong, while defendant challenges plaintiff's skill set and knowledge relative to the position of lineman, it does not seriously contend that plaintiff's qualifications were not "at least equivalent to the minimum objective criteria required for employment in the relevant field." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575-76 (6th Cir. 2003); *see also Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000) (in analyzing the third prong, "a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff").

The parties vigorously dispute whether plaintiff can meet the fourth and final prong by establishing that Ohio Edison treated a similarly situated non-minority employee more favorably. To satisfy the similarly situated requirement, a plaintiff must show that the comparable employee is similar "in all of the *relevant* aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1988) (internal quotation marks omitted, emphasis in original); *see Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000) (noting that the plaintiff need not demonstrate an "exact correlation" between himself and the comparable employee, but instead must establish

11

"relevant similarity") (citing *Ercegovich*, 154 F.3d at 352). "In the disciplinary context," the Sixth Circuit has "held that to be found similarly situated, a plaintiff and his proposed comparator must have engaged in acts of 'comparable seriousness.'" *Ortiz v. Hershey Co*., 580 F. App'x 352, 357 (6th Cir. 2014) (quoting *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916-17 (6th Cir. 2013); *see Wright v. Murray Guard, Inc*., 455 F.3d 702, 710 (6th Cir. 2006) (citation omitted). "'To make this assessment, a court must look to certain factors, such as whether the individuals have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ortiz*, 580 F. App'x at 357 (quoting *Martinez*, 703 F.3d at 917) (further quotation marks and citations omitted); *Wright*, 455 F.3d at 710 (same) (quotation marks and citation omitted).

Plaintiff has identified twenty-one employees outside the protective class whom he believes engaged in misconduct of comparable seriousness but received more favorable treatment.[7] Ohio Edison challenges plaintiff's proposed comparator employees on grounds that: (1) their conduct was less egregious than plaintiff's, (2) they did not share plaintiff's record of poor work performance and disciplinary problems, and/or (3) they were not disciplined by the same decision-maker. (MSJ Reply at 820-25.)

### Different Decision-makers

The Sixth Circuit "has previously held that a plaintiff and a comparable employee are not

---

[7] Plaintiff identified fifteen Caucasian employees whom he believed had engaged in violent and/or aggressive behavior: Kenneth Evans, Randy Adams, Robert Pinchot, Brian Tedesco, Pete Meshimer, Tom Watson, Mike Davila, Rich Kaszowski, Jeffrey Brown, Dick Solomen, Dustin Cook, Chase Pine, Michael Schneider, Michael Smith, and James Tanner. (Opp'n at 525-27.) Plaintiff identified an additional six employees whom he believed were disciplined less harshly for safety violations: Matt McGregor, Pat Merril, Craig Schmidt, Steve Martin, Scott Anderson, and Bill Schaffer. (*Id*. at 527-28.)

similarly situated where they were disciplined by different ultimate decision-makers." *Barry v. Noble Metal Processing, Inc.*, 276 F. App'x 477, 481 (6th Cir. 2008) (citing S*mith v. Leggett Wire Co.*, 220 F.3d 752, 762-63 (6th Cir. 2000)); *see also Johnson v. Interstate Brands Corp.*, 351 F. App'x 36, 39 (6th Cir. 2009) (noting that the "relevant inquiry" for purposes of the similarly situated analysis is not whether the plaintiff and the comparators shared the same immediate supervisor, but whether the "respective discipline was determined by the same ultimate decision makers") (citations omitted).

It is undisputed that Hampson, then General Manager of Operations for Ohio Edison, made the decision to discharge plaintiff. Yet, plaintiff has failed to identify any proffered comparator who was disciplined by Hampson. In fact, plaintiff only points to record evidence identifying the decision-maker in three of the fifteen situations he believed involved non-protected employees who violated the workplace violence policy but received more favorable treatment. Robert Suttle, Ohio Edison's General Manager in 2010, disciplined Kenneth Evans; Suttle and David Vilao, a Meter Reading Manager, disciplined Randy Adams;[8] and William Colleta, Trumbull Operations Manager, disciplined Robert Pinchot. (Doc. Nos. 23-6 to 23-8 (disciplinary letters) at 800-04.) The fact that plaintiff's evidence demonstrates that individuals other than Hampson disciplined plaintiff's comparable employees, alone, is sufficient to derail his attempt to establish that similarly situated employees received more favorable treatment. *See, e.g., Corell v. CSX Transp., Inc.*, 378 F. App'x 496, 502 (6th Cir. 2010) ("the parties do not dispute that Corell and White were disciplined by different decisionmakers and that, at all relevant times, they had different supervisors. Thus, they are not comparable . . . .") (citations

---

[8] While Suttle was once plaintiff's supervisor, there is nothing in the record to support a finding that he participated in the decision to discharge plaintiff.

13

omitted); *Benjamin v. Brachman*, 246 F. App'x 905, 926 (6th Cir. 2007) (alleged comparables were not similarly situated because the decision to revoke medical privileges was not made by the same decision-maker).

*Plaintiff's Misconduct was More Severe and Pervasive*

Defendant argues that plaintiff's prima facie case falls apart for the additional reason that plaintiff's misconduct was far more egregious than that of his non-protected comparators. "In order for the conduct of a comparable employee and the Title VII plaintiff to be considered the 'same conduct,' it must be similar in kind and severity." *Barry*, 276 F. App'x at 483 (quoting *Clayton v. Meijer, Inc*., 281 F.3d 605, 611 (6th Cir. 2002)); *see Johnson*, 351 F. App'x at 40 (requiring conduct to be of "comparable seriousness") (citations omitted).

Here, the record evidence plaintiff highlights regarding other acts of violence in the workplace is sketchy at best, making any comparison difficult. Still, it would appear that many of the incidents involved isolated acts of aggression that were quickly resolved, often without the filing of an internal complaint. For example, Brian Tedesco and Pete Meshimer were involved in a yelling match that resulted in pushing. There is no evidence that either employee engaged in any further acts of aggression toward the other. (Doc. No. 23-3 (Deposition of Antonio Gomez ["Gomez Dep."]) at 686-89.) Similarly, Davila, the lineman who filed the complaint against plaintiff, engaged in horseplay on the dock with a co-worker. Their supervisor, Rich Kaszowski, testified that the two began to wrestle and he simply broke it up out of fear that this friendly

14

physical interaction could escalate into something dangerous.[9] (Doc. No. 23-2 (Deposition of Richard Kaszowski ["Kaszowski Dep."]) at 636 ["It was all laughing more than anything"].)

In contrast, plaintiff's alleged acts of aggression against Davila were part of a pattern of threats and intimidation taking place over a period of several months and growing in intensity over time. The repeated nature of Moore's threats was an important factor in Ohio Edison's decision to terminate his employment. (Hampson Aff. ¶¶ 10(a), 11.) The fact that the threats became more and more menacing, beginning as vague references to getting even and escalating into specific threats to employ others to have Davila "taken out," made the pattern all the more disturbing, and caused Moore's co-worker to fear for his own safety and that of his family.

Indeed, that none of the other comparators caused their intended victims to fear for their safety also distinguishes plaintiff's misconduct. No other cited violation of the company's workplace violence policy resulted in the intended victim seeking a restraining order or contacting the local authorities. *See Taylor v. CNA Corp.*, 782 F. Supp. 2d 182, 195 (E.D. Va. 2010) (distinguishing plaintiff's workplace violence as more serious than comparator who also engaged in intimidating behavior because only the plaintiff's conduct "was significant enough to lead a fellow employee to fear for his own safety"). Yet, Davila was sufficiently concerned to cause him to seek judicial and police intervention, and his request for outside protection resulted

---

[9] In his opposition brief, plaintiff suggests that Davila was involved in another altercation wherein he told a fellow employee, Jim Bean, that he was going to "kick his ass." (MSJ Opp'n at 526.) In support, he cites to the deposition testimony of Antonio Gomez. However, Gomez clearly testified that he had no first-hand knowledge of the incident, and was relying exclusively on what others had told him. (Gomez Dep. at 694.) "It is well established that a court may not consider hearsay when deciding a summary judgment motion." *Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012) (collecting cases).

in the issuance of a restraining order and a criminal conviction. Ohio Edison was entitled to take into consideration the results of plaintiff's conduct in imposing harsher discipline. *See Johnson*, 351 F. App'x at 40 (observing that an employer is "permitted to consider the consequences of the conduct" in finding that certain workplace violence warrants more severe discipline) (citing *Clayton*, 281 F.3d at 611).

*Plaintiff was Discharged for More than just Workplace Violence*

To be sure, a handful of the isolated incidents of workplace violence cited by plaintiff approached the severity of plaintiff's asserted repeated misconduct, especially those that were accompanied by physical contact. Rich Kaszowski testified that, before he became a manager, he exchanged heated words with a co-worker and the dispute ultimately resulted in a fist fight. (Kaszowski Dep. at 624-27.) While neither employee was disciplined, Kaszowski did not know if management was ever made aware of the incident. (*Id.* at 627.) This situation, therefore, cannot be used to demonstrate that non-protected employees received more favorable treatment from Ohio Edison.

Even if management had been aware of the altercation, Kaszowski would not be a proper comparable because plaintiff was not discharged solely for workplace violence. Hampson was clear that he also factored into his decision to terminate plaintiff's employment plaintiff's record of poor performance, prior disciplinary issues, and history of violence. (Hampson Aff. ¶¶ 9-11.) Where a comparable employee has not engaged in a similar range of conduct, or does not share the plaintiff's poor performance and disciplinary record, his more favorable treatment cannot support a prima facie case. *See Ortiz*, 580 F. App'x at 357 (non-protected employees accused of workplace violence were not proper comparators where they were not working on a last chance agreement or had a "comparable record of quality control violations"); *Singfield*, 389 F.3d at 562

16

(because "none of the employees cited allegedly engaged in the range of activities for which Singfield was disciplined, no employee is similarly situated"); *Braithwaite v. Timken Co.*, 258 F.3d 488, 497 (6th Cir. 2001) (employees accused of only violating one of the two rules plaintiff violated were not similarly situated) (citation omitted).

No other employee had a history of performance issues and disciplinary problems that rivaled plaintiff's record, and this fact serves to further distinguish plaintiff from his proposed comparators. While plaintiff's evidence would support a finding that some of the cited employees had previously been disciplined for workplace violence on more than one occasion, plaintiff points to no evidence that these same employees also struggled with performance and safety issues.[10] Additionally, plaintiff, alone, had a criminal record of violence. Ohio Edison was entitled to treat more seriously plaintiff's threats and acts of intimidation when it was aware that they came from an individual with a history of violence both on and off the job. *See, e.g., Black v. Sysco Foods of Houston*, 512 F. Supp. 2d 1030, 1036 (S.D. Tex. 2007) (distinguishing potential comparator because the employee, unlike the plaintiff, "had no previous warnings for threatening conduct, and he had no criminal record displaying a propensity for violent actions").

---

[10] Plaintiff also identified six employees who were disciplined for workplace safety issues involving company vehicles, but there is no evidence that these same employees also engaged in acts violence. They are, therefore, not comparators for purposes of evaluating plaintiff's discharge. However, plaintiff suggests that the fact that he received a longer suspension for his workplace truck accident than these other individuals demonstrates that even his past discipline was harsher than that received by similarly situated non-protected workers. (MSJ Opp'n at 527-28.) There are several problems with plaintiff's argument. First, the only question before the Court is whether plaintiff's discharge was the result of race discrimination. He cannot use this lawsuit to litigate prior decisions that would surely be time-barred now. Second, as was the case with many of the workplace violence comparators, plaintiff has offered insufficient information regarding these prior incidents to permit meaningful comparison. In fact, he points to no record evidence to support two of the six alleged comparators. Such a showing on summary judgment is woefully inadequate. Of the four that find some record support, none of those employees compounded the problem by leaving the scene or failing to immediately report the accident to their supervisor as plaintiff did. (*See, e.g.,* Kaszowski Dep. at 648-49 (after Matt McGregor flipped his truck, he immediately reported the accident.).)

*Conclusion*

Unfortunately for plaintiff, there are simply too many relevant distinctions between himself and his cited comparators to support a finding that he was treated more harshly than similarly situated non-protected employees. Therefore, plaintiff has failed to establish a prima facie case, and his federal and state law discrimination claims fail as a matter of law.

### B.      Defendant's Legitimate, Nondiscriminatory Reason

If the Court had determined that plaintiff did in fact demonstrate a prima facie case of racial discrimination, the burden of production would then shift to defendant to offer some legitimate, nondiscriminatory reason for terminating plaintiff's employment. This burden is not onerous. *See Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) ("This burden is one of production, not persuasion; it 'can involve no credibility assessment.'") (quoting *St. Mary's Honor Ctr*., 509 U.S. at 509). Defendant maintains that Hampson made the decision to terminate plaintiff, following an internal investigation, based upon plaintiff's violation of the workplace violence policy, his poor performance, and his work record. (Hampson Aff. ¶ 9.) This easily satisfies defendant's burden of production and shifts the burden back to plaintiff to demonstrate pretext.

### C.      Pretext

Ohio Edison insists that there is no evidence that Hampson's reasons for terminating Moore were pretextual as they were "well-grounded in fact." (MSJ at 129.) According to defendant, the decision came after an internal investigation confirmed that Moore made threats to injure and kill Davila. Such a determination was consistent with the state common pleas court's finding that plaintiff had engaged in a pattern of harassment sufficient to warrant the imposition of a restraining order. Further, these threats clearly fell within the company's workplace violence

18

policy that defined violent behavior as including acts of intimidation, threats, slander, and ridicule. (Workplace Violence Policy at 316.) Because the internal complaint allegations of threats and intimidation were confirmed by co-workers and two different courts, defendant argues that plaintiff cannot demonstrate that defendant did not "honestly believe" in the proffered non-discriminatory reason given for its adverse employment action.

"The Sixth Circuit has adopted an 'honest belief' rule that protects employers against a finding of pretext when they have a reasonable basis for taking the adverse employment action at issue: 'for an employer's proffered non-discriminatory basis for its employment action to be considered honestly held, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.'" *Mulvin v. City of Sandusky*, 320 F. Supp. 2d 627, 636 (N.D. Ohio 2004) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). Where an employee is unable to point to a material dispute as to whether the "employer made a 'reasonably informed and considered decision' that demonstrates an 'honest belief' in the proffered reason for the adverse employment action, the case should be dismissed since no reasonable juror could find that the employer's adverse employment action was pretextual." *Braithwaite*, 258 F.3d at 494.

To raise a material dispute, a plaintiff must show "'more than a dispute over the facts upon which the discharge was based.'" *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Braithwaite*, 258 F.3d at 493-94). It is not enough that the employee presents evidence showing that the employer was wrong about the truth of the facts upon which

it based its decision.[11] *Id*. at 285-86 ("As long as the employer held an honest belief in its proffered reason, 'the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless.'") (quoting *Smith*, 155 F.3d at 806). Instead, he must come forward with evidence showing that such an error is "'too obvious to be unintentional.'" *Id*. (quoting *Smith*, 155 F.3d at 807).

Plaintiff attempts to draw from a number of sources to show that Ohio Edison could not have maintained an honestly held belief that plaintiff violated the workplace violence policy. He claims that "it is clear that the proffered reason was insufficient to motivate the discharge in light of the overwhelming evidence presented by Moore that conduct like that which he was alleged to have engaged in did not typically lead to discharge from employment." (MSJ Opp'n at 533.) As discussed earlier, plaintiff's comparators were not similarly situated in all relevant respects and, therefore, their more favorable treatment does not support even an inference that the difference in their treatment was the result of race discrimination.

Plaintiff also points to a racially motivated remark purportedly made by Doug Shaffer, a supervisor with Ohio Edison. In his deposition, plaintiff testified that, in October of 2011, "Dan Hardman, who was a foreman at the time," told plaintiff that "Doug Shaffer came into a supervisor's meeting and said he wanted [plaintiff's] black ass out of the company." (Moore Dep. at 387.) Of course, "[h]earsay evidence may not be considered on summary judgment."

---

[11] Thus, plaintiff's suggestion that he can "demonstrate that the proffered reason for his discharge—that he violated the Ohio Edison workplace violence policy—is false, because he did not actually assault or threaten Michael Davila" would not be sufficient, on its own, to deprive defendant of the benefit of the honest belief rule. (MSJ Opp'n at 532.)

*Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999) (citation omitted); *see Suits v. The Heil Co.*, 192 F. App'x 399, 402-03 (6th Cir. 2006) (employee's claim that her supervisor called her a "hottie ass" during a conversation with another employee was "clearly hearsay" and had no probative value). Plaintiff had no first-hand knowledge of this remark, and failed to come forward with competent evidence from anyone who did. It, therefore, may not be considered on summary judgment.

Even if evidence of the remark was properly before the Court, it would be insufficient to establish pretext. "Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself cannot suffice to satisfy the plaintiff's burden of demonstrating animus." *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) (quotation marks and citation omitted); *see also McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161-62 (6th Cir. 1990) (statements of intermediate level management officials were not indicative of discrimination where the ultimate decision to discharge was made by an upper-level official) (citation omitted). The only evidence before the Court confirms that Hampson, and Hampson alone, made the decision to terminate plaintiff's employment.[12] Shaffer's alleged stray remark,

---

[12] The record does reflect that Shaffer was one of several individuals—including plaintiff, Davila, and a union representative—who was present during the employee interviews conducted as part of the company's internal investigation. (*See* Hampson Aff., Appx. 2, at 312.) Beyond attendance at these fact-finding sessions, there is nothing in the record to suggest that Shaffer played any further role in the investigation or participated in the ultimate decision.

therefore, cannot establish pretext.[13]

In a final effort to raise an inference of pretext, plaintiff cites to the fact that he received Hampson's letter of dismissal before he was given an opportunity to be heard at the second stage grievance hearing. Plaintiff argues that "[b]y failing to follow its own policies and by discharging Moore prior to listening to what he had to say, Ohio Edison cannot now claim it acted in 'good faith' on its 'honest belief.'" (MSJ Opp'n at 537.) However, the record reflects that plaintiff was given an opportunity to be heard before the decision to terminate his employment was made. It is clear that plaintiff was present during a fact finding meeting, during which he was permitted to respond to the allegations in Davila's internal complaint. (*See* Hampson Aff., Appx. 2, at 312-15.) As the record reflects, he denied all of the allegations. (*Id*.) Accordingly, defendant was fully aware of Moore's version of events before the decision was made.

Of course, even if Ohio Edison had made the decision to terminate Moore's employment before it heard from him, this would not have demonstrated pretext or deprived defendant of the benefit of the honest belief rule. It is well settled that "an 'optimal' investigation—i.e.,

---

[13] Even if true, and even if it had been made by a decision-maker, an isolated, stray remark made nearly five months before Davila's complaint and plaintiff's termination, would not support an inference of racial discrimination. "To be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process." *Lockett v. Marsh USA, Inc*., No. 1:06CV35, 2007 WL 2907894, at *8 (N.D. Ohio Oct. 3, 2007) (quotation marks and citation omitted); *see also Tomblin v. Local 496, Laborers' Int'l Union of N. Am*., 20 F. Supp. 2d 1136, 1145 (N.D. Ohio 1998) ("Isolated incidents of racial epithets simply are not sufficient to establish a claim of race discrimination.") (citations omitted). Likewise, a stray remark by a co-worker in 2006 that "I don't like you or your kind" (*see* Moore Dep. at 385-86) and one in 2010 by another fellow employee that "Your black ass better not get any dirt in that splice" (*id*. at 386) are too remote to establish pretext, even if they had been made by an ultimate decision-maker.

interviewing the employee and some or all of his witnesses—is not a prerequisite to application of the honest belief rule." *Seegar*, 681 F.3d at 286 (quotation marks and citation omitted). The employer is not required to leave "'no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *McConnell v. Swifty Transp., Inc*., 198 F. App'x 438, 443 (6th Cir. 2006) (quoting *Smith*, 155 F.3d at 807) (holding that employer had an honest belief where it made the decision to terminate the plaintiff before questioning him, but gave him an opportunity to explain).

In *Hale v. Mercy Health Partners*, the plaintiff attempted to establish pretext by highlighting the fact that the employer had prepared a termination letter prior to the meeting with the plaintiff. *Hale*, 20 F. Supp. 3d 620, 632 (S.D. Ohio 2014). In granting the employer summary judgment, the court underscored the fact that the employer had before it undisputed evidence that the employee had altered time cards and that the employee was given an opportunity to defend herself.[14] *Id*. at 633-34 (citing, among authority, *McConnell*, 198 F. App'x at 444). Similarly here, while the termination letter was mailed to plaintiff before the hearing, Ohio Edison had before it considerable evidence, substantiated from multiple sources, that plaintiff had violated the workplace violence policy. Additionally, it is undisputed that plaintiff was given an

---

[14] In reaching this conclusion, the court in *Hale* distinguished a prior Sixth Circuit case finding that an employer could not rely on the honest belief rule where it had made the decision to terminate the plaintiff's employment before giving the plaintiff a chance to respond to the allegations against him. *Id*. at 633 (citing *Archer v. Mesaba Aviation Inc*., No. 98-2434, 2000 WL 376677 (6th Cir. Apr. 3, 2000)). As the court in *Hale* noted, in *Archer*, the employer had before it conflicting allegations, and actually terminated the plaintiff before he was even advised of the allegations against him. Under those circumstances, the Sixth Circuit concluded that the employer could not demonstrate that it reasonably relied on particularized facts in reaching its decision. *Archer*, 2000 WL 376677, at *5. Here the particularized facts all pointed in the direction of a finding that plaintiff had violated the workplace violence policy, and plaintiff was afforded multiple opportunities to give his version of the events before and after the termination letter was mailed.

opportunity at the step two grievance hearing to, once again, address the allegations in Davila's complaint. While the timing of the termination letter was unfortunate, based upon the record available to Ohio Edison at the time of the discharge, the Court cannot say that defendant's belief that termination was warranted "was not honestly held." *See McConnell*, 198 F. App'x at 444.

Because plaintiff has failed to establish a material dispute as to the existence of pretext, plaintiff's insistence that the decision to terminate him was based on false allegations generated by Davila and other non-managerial co-workers is insufficient to deprive defendant of the honest belief rule. Accordingly, Ohio Edison is entitled to summary judgment on plaintiff's race discrimination claims for this additional reason.

## IV. PLAINTIFF'S RETALIATION CLAIM

Ohio Edison also seeks dismissal of plaintiff's state law retaliation claim. Retaliation claims are examined using the same burden-shift framework used in considering discrimination claims. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013) (citation omitted); *see also Baker v. The Buschman Co.*, 713 N.E.2d 487, 491 (Ohio Ct. App. 1998) ("Federal law provides the applicable analysis for reviewing retaliation claims") (quotation marks and citations omitted). To set forth a prima face case of retaliation under Ohio law, plaintiff must establish that: (1) he engaged in a protected activity; (2) his engagement in that protected activity was known to his employer; (3) his employer, thereafter, took an adverse employment action against him; and (4) a causal link exists between his protected activity and the adverse employment action. *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000) (citations omitted); *Greer-Burger v. Temesi*, 879 N.E.2d 174, 180 (Ohio 2007) (citation omitted). To establish a causal connection, Moore must offer direct evidence of retaliation or knowledge coupled with closeness in time that creates an inference of causation. *Nguyen*, 229 F.3d at 566 (citation

omitted). However, close temporal proximity between the employer's knowledge of the protected activity and the adverse employment action constitutes evidence of a causal connection only if the adverse employment action occurs "very close" in time. *Ellis v. Jungle Jim's Mkt., Inc.*, 44 N.E.3d 1034, 1054 (Ohio Ct. App. 2015) (citations omitted).

The record reflects that, in 2009, plaintiff filed a charge of race discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Moore Dep. at 385.) Plaintiff also testified in his deposition that, sometime between 2010 and October 2011, he "complained" of discrimination to several individuals about various remarks made and actions taken against him. (*Id*. at 385-87.) For example, he testified that in 2010 he complained to his union president that a line leader had warned him, "Your black ass better not get any dirt into that splice." (*Id*. at 386.) According to plaintiff, the matter was not resolved to his satisfaction, causing him to file a charge of discrimination against the union and Ohio Edison later in the year, which was then mediated.[15] (*Id*. at 387.) Finally, he claims that in October 2011 he complained to Hampson about Shaffer's comment that he wanted plaintiff's "black ass" out of the company. (*Id*.)

Assuming for purposes of summary judgment that all of these complaints represented protected activity, the interval in time between the activity and plaintiff's termination—three years in the case of his EEOC charge, and between five months and a year or more in the case of the alleged informal complaints—is too long to support an inference of discrimination. *See Kean*

---

[15] Plaintiff also stated that in September 2006 he told his union representative, Brian Tedesco, that a co-worker told him, "I don't like you or your kind." (Moore Dep. at 385.) In October of the same year, he told Tedesco that someone had placed a small African flag on his chair. (*Id*. at 386.) There is no record of these complaints and plaintiff testified that neither complaint proceeded beyond his union representative, who advised him to drop both verbal complaints. Because there is no evidence that defendant was even aware of these complaints, they cannot support a claim of retaliation. *See Mulhall v. Ashcroft*, 287 F.3d 543, 554 (6th Cir. 2002) (finding no reasonable jury could find retaliation where plaintiff "failed to produce evidence sufficient to establish that the officials taking the adverse employment action knew of his protected activity").

*v. IT-Works, Inc.*, 466 F. App'x 468, 471 (6th Cir. 2012) (discharge that "came roughly two-and-a-half months after the complaint" did not support "an inference of causation") (citation omitted); *see, e.g., Kimbrough v. Cincinnati Ass'n for Blind & Visually Impaired*, 986 F. Supp. 2d 904, 918 (S.D. Ohio 2013) (gap of five months between protected activity and termination not sufficient); but see *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (finding that less than three months between the protected activity and the retaliation established causation).

Yet, plaintiff suggests that he has evidence that he engaged in protected activity as late as February 29, 2012—less than six days before he was discharged—when he filed an internal complaint against Davila. (MSJ Opp'n at 536-37, citing Doc. No. 23-10 (Plaintiff Internal Complaint ["Moore Int. Compl."]), beginning at 810.) There are two reasons why this activity does not constitute even a scintilla of evidence of retaliation. First, by the time plaintiff filed his internal complaint, plaintiff was well aware that he was being investigated for the workplace violations alleged in Davila's complaint and that a decision on the status of his employment with Ohio Edison was imminent. Defendant cannot insulate himself from discipline by attempting to engage in protected activity *after* the disciplinary process against him has been set in motion. *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014) (noting that "[t]he Supreme Court has expressed a concern that employees who see the proverbial writing on the wall that they are about to be fired should not be able to use Title VII protections to insulate themselves from adverse employment actions that were previously contemplated"), citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, --U.S.--, 133 S. Ct. 2517, 2532, 186 L. Ed. 2d 503 (2013)). Thus, "[w]hen the employer 'proceed[s] along lines previously contemplated,' [the court] must not take the temporal proximity of the adverse employment action as evidence of causality." *Id*.

26

(quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)); *see also Beard v. AAA of Mich.*, 593 F. App'x 447, 451 (6th Cir. 2014) ("An employer cannot allege discrimination like a protective amulet when faced with the possibility that his preexisting disciplinary problems could lead to his termination."). Because Ohio Edison had already set in motion the disciplinary process that would ultimately lead to plaintiff's termination, and there is no evidence that it deviated from its standard disciplinary process after it learned of plaintiff's internal complaint, the temporal proximity of the adverse action cannot support a prima facie case. *See, e.g., Van Winkle v. HM Ins. Grp., Inc.*, 72 F. Supp. 3d 723, 736-37 (E.D. Ky. 2014).

More fundamentally, however, the belated internal complaint cannot support plaintiff's retaliation claim because it does not constitute "opposition activity." "In order to engage in protected opposition activity . . . a plaintiff must make an overt stand against suspected illegal discriminatory action." *Coch v. Gem Indus., Inc.*, No. L-04-1357, 2005 WL 1414454, at *5 (Ohio Ct. App. June 17, 2005) (quotation marks and citation omitted); *see also Fox v. Eagle Distrib. Co., Inc.*, 510 F.3d 587, 592 (6th Cir. 2007) (holding that the plaintiff's statements about suing the company were not protected where they did not specifically allege discriminatory employment practices).

In *Lockett v. Marsh USA, Inc.*, 354 F. App'x 984, 997 (6th Cir. 2009), the plaintiff brought suit for retaliation under Ohio Rev. Code § 4112.02(I), alleging that she was terminated for preparing a report on the performance of another employee. The Sixth Circuit affirmed the district court's grant of summary judgment for the employer because the report was not "protected opposition activity." *Id*. Specifically, it did not take an overt stand against illegal discriminatory practices; nor did it even mention the term "discrimination," and there was no

27

evidence that the employer would have understood the report to be charging discrimination. *Id*.

Similarly here, the internal complaint filed by Moore does not allege that Davila or any other Ohio Edison employee engaged in unlawful discrimination. (Moore Int. Compl. at 810-13.) Notably, while the form included a section where Moore could indicate the basis of his complaint by checking box next to various types of discrimination, no boxes were checked. Instead, he stated merely that Davila discriminated against him for "personal reasons" by falsely claiming that he had threatened Davila.[16] (*Id*.) Additionally, while plaintiff complained about a laundry list of misconduct by Davila—including refusing to drive the company truck and reporting plaintiff for permitting an ineligible employee to drive the truck—there was nothing about the nature of any of these acts that would have alerted defendant to the fact that plaintiff believed he was the victim of racial discrimination or retaliation for engagement in protected activity. (*Id*.) As a matter of law, this vague internal complaint does not constitute protected activity. *See Booker v. Brown & Williamson Tobacco Co., Inc*., 879 F.2d 1304, 1313 (6th Cir. 1989) ("[A] vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice.").

Because plaintiff has failed to demonstrate a close temporal proximity between his protected activity and the adverse employment decision, he must come forward with additional evidence of retaliatory conduct to establish causation. *Ellis*, 44 N.E.3d at 1054. Yet, the only additional evidence plaintiff points to is his belief that "he was treated much more harshly than other employees who committed far more serious violations of the company's violence in the

---

[16] Plaintiff did check the box labeled "Retaliation," however, it is clear that the retaliation of which plaintiff complains was not in response to protected activity, but involved "retaliation actions against [him] for personal reasons outside of First Energy employment." (*Id*. at 811, capitalization omitted.)

workplace policy." (Opp'n at 536.) Plaintiff's alleged comparators were not similarly situated in all relevant respects. As such, evidence of their treatment would no sooner prop up a claim of retaliation than it would support a claim of discrimination. *See, e.g., Kimbrough*, 986 F. Supp. 2d at 919-20 (evidence that other employees with "attitude" problems were treated more favorably did not support claim of retaliation where the comparators did not engage in comparable conduct). Because plaintiff has failed to demonstrate a prima facie case, his retaliation claim fails as a matter of law for this reason alone.[17]

## V.  CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment (Doc. No. 20) is granted in its entirety. This case is dismissed.

**IT IS SO ORDERED**.


Dated: December 6, 2016

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[17] Of course, had plaintiff established a prima facie case, the burden-shifting analysis would have yielded the same result as plaintiff's discrimination claims, inasmuch as defendant's legitimate, non-discriminatory reason for discharge—plaintiff's violations of the workplace violence policy, prior disciplinary and performance issues—was not rebutted by evidence of pretext.